## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                          No. CR 09-3229 JB

YESSENIA DIAZ,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's: (i) Objections to the Pre-Sentence Report, filed October 24, 2011 (Doc. 29)("Objections"); and (ii) Sealed Sentencing Memorandum, filed October 25, 2011 (Doc. 30)("Sentencing Memorandum"). The Court held a hearing on October 27, 2011. The primary issues are: (i) whether the Court should sustain Defendant Yessenia Diaz' Objections to numerous facts included in the Presentence Investigation Report (disclosed March 3, 2011)("PSR"), including the inclusion of crimes unrelated to Y. Diaz' conduct and regarding Y. Diaz' involvement in the Aispuro Drug Trafficking Organization ("Aispuro DTO"); (ii) whether Y. Diaz qualifies for a minor role adjustment under U.S.S.G. § 3B1.2; and (iii) whether the Court should vary downward to a sentence of 2-years probation. The Court will sustain the Objections, because the United States represented that it could not prove the facts included in the PSR, to which Y. Diaz objects, by a preponderance of the evidence. The Court also accepts the parties' stipulation that Y. Diaz qualifies for a minor role adjustment. Accordingly, the Court will modify the PSR to reflect those changes. The Court will impose a sentence of 3-years probation with eight months electronic monitoring.

## FACTUAL BACKGROUND

In June 2008, the Federal Bureau of Investigation ("FBI") began an investigation targeting the Aispuro DTO.  See PSR ¶ 14, at 5.  Y. Diaz was identified as Javier Aispuro's girlfriend at the time of the investigation.  See PSR ¶ 59, at 15.  Aispuro was the leader/organizer of the DTO.  See PSR ¶ 24, at 8.  Y. Diaz would transmit some of the proceeds of the Aispuro DTO to Mexico via wire transfers.  See PSR ¶ 59, at 15.  Between July 27, 2008 and December 10, 2008, thirteen transactions of money laundering by Y. Diaz were documented through wiretapped telephone conversations.  See PSR ¶ 60, at 16.  Y. Diaz sent at least $8,230.00 to Mexico via wire transfer.  See PSR ¶ 60, at 16.  Y. Diaz followed Aispuro's instructions and regularly sent money via Western Union wire transfers to Mexico.  See PSR ¶ 62, at 16.  Y. Diaz was aware that the money represented the proceeds from the Aispuro DTO, and she made the transfers to conceal from whom the money originated.  See Plea Agreement ¶ 7, at 3, filed November 6, 2009 (Doc. 4).  Additionally, Y. Diaz opened a business account for Amazing Audio and Detail, a business owned by Aispuro and Adam Anderson, another member of the Aispuro DTO.  See PSR ¶¶ 35, 62, at 10, 16.

## PROCEDURAL BACKGROUND

On November 6, 2009, Y. Diaz pled guilty to an Information, filed November 6, 2009 (Doc. 1), which charged a violation of 18 U.S.C. § 1956(a)(2), that being International Money Laundering.  See Plea Agreement ¶ 3, at 2.  The parties stipulated that: (i) transactions of at least $5,000.00 but less than $10,000.00 in United States Currency is attributable to Y. Diaz; (ii) pursuant to U.S.S.G. § 3B1.2, Y. Diaz was a minor participant in the criminal activity; (iii) so long as she continues to accept responsibility, Y. Diaz is entitled to a 3-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1; and (iv) they each reserved their rights to assert any position or argument with

respect to the sentence to be imposed.  See Plea Agreement ¶ 9(a)-(f), at 4-5.

The United States Probation Office ("USPO") disclosed a PSR for Y. Diaz on March 3, 2011.  In paragraphs 5 through 12, the PSR lists as "Related Case Information" the cases filed against the following individuals: (i) Aispuro; (ii) Marcus Chavez; (iii) Anderson; (iv) Brian Disher; (v) James Griego; (vi) Simon Ronquillo; (vii) Edgar LNU; and (viii) Felipe Diaz.  PSR ¶¶ 5-12, at 4-5.  In the "Offense Conduct" section, the USPO documents the investigation of the Aispuro DTO. PSR at 5.  It notes that the FBI targeted the Aispuro DTO and that search warrants were executed on December 17, 2008.  See PSR ¶ 14, at 5.  The PSR states that eight co-defendants were arrested and charged with conspiracy, Y. Diaz was charged with International Money Laundering, and fifteen other co-conspirators were identified, but not charged.  See PSR ¶ 14, at 5.  The PSR states that Aispuro distributed "multiple pounds of methamphetamine as the lead of the DTO since at least 2007."  PSR ¶ 15, at 5.  The PSR notes that the Aispuro DTO was one of the largest suppliers of methamphetamine in the Albuquerque, New Mexico area, and that it distributed twenty to fifty pounds of methamphetamine a week.  See PSR ¶¶ 16-18, at 6-7.  The PSR indicates that Y. Diaz was a member of the DTO.  See PSR ¶ 19, at 7.  The PSR states that further investigation into the Aispuro DTO  revealed that it was also involved in money laundering and would: (i) transport bulk amounts of currency to California; (ii) use small businesses to conceal the drug money; and (iii) wire money to Mexico.  See PSR ¶¶ 20-22, at 7-8.  In paragraphs 24 through 63, the PSR documents the role of each co-Defendant involved in the conspiracy and Y. Diaz' role.

The PSR calculates that Y. Diaz has a base offense level of 10 pursuant to U.S.S.G. § 2S1.1(a)(1) for laundering of monetary instruments.  See PSR ¶ 69, at 17.  The USPO states, however, that Y. Diaz was present with Aispuro during a number of drug transactions in which he participated and that she should be held accountable for at least 19.278 net kilograms of

methamphetamine, resulting in a base offense level of 38. <u>See</u> PSR ¶ 69, at 18. The USPO concedes that, pursuant to the Plea Agreement, Y. Diaz is only to be held accountable for between $5,000.00 and $10,000.00 in United States Currency. <u>See</u> PSR ¶ 69, at 18. The PSR then includes a 6-level increase under U.S.S.G. § 2S1.1(b)(1),[1] because Y. Diaz knew that the laundered funds were the proceeds of, or were intended to promote, the manufacture, importation, or distribution of a controlled substance. <u>See</u> PSR ¶ 70, at 18-19. The PSR also includes a 2-level increase pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because Y. Diaz was convicted pursuant to 18 U.S.C. § 1956. <u>See</u> PSR ¶ 71, at 19. It also applies a 2-level reduction, pursuant to U.S.S.G. § 3B1.1(c) and to the Plea Agreement, for her role as a minor participant. <u>See</u> PSR ¶ 73, at 19. The USPO suggests, however, that, because Y. Diaz was present with Aispuro during the drug transactions, Y. Diaz can be seen

---

[1]U.S.S.G. § 2S1.1(b)(1) provides:

**(a)**    Base Offense Level:

    **(1)**    The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined; or

    **(2)**    8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise.

**(b)**    Specific Offense Characteristics:

    **(1)**    If (A) subsection (a)(2) applies; and (B) the defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote (i) an offense involving the manufacture, importation, or distribution of a controlled substance or a listed chemical; (ii) a crime of violence; or (iii) an offense involving firearms, explosives, national security, or the sexual exploitation of a minor, increase by 6 levels.

as having an "otherwise extensive role" in the organization and warranting an aggravating role adjustment.  PSR ¶ 73, at 19.  The PSR applies a 3-level reduction to the base offense level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.  See PSR ¶ 76, at 20.  The PSR calculates that Y. Diaz' total offense level is 13.  See PSR ¶ 77, at 20.  The USPO indicates that Y. Diaz has 1 criminal history point, establishing a criminal history category of I.  See PSR ¶ 80, at 20.  The USPO calculates that a total offense level of 13 and a criminal history category of I establishes a guideline imprisonment range of 12 to 18 months.  See PSR ¶ 105, at 25.

On October 24, 2011, Y. Diaz filed her Objections to the PSR.  See Doc. 29.  Y. Diaz objects to paragraphs 5 through 58 on the grounds that those paragraphs contain information about individuals and their crimes that are not sufficiently related to her offense conduct.  See Objections ¶ 1, at 1.  Y. Diaz asserts that this "extraneous information . . . is unduly prejudicial and misleading." Objections ¶ 1, at 1.  Y. Diaz contends that the United States Bureau of Prisons ("BOP") will use the PSR's factual allegations to determine her classification within the facility.  Objections ¶ 1, at 1-2.  She requests that the Court hold an evidentiary hearing, should it find that those paragraphs contain relevant conduct attributable to her.  See Objections ¶ 1, at 2.  Y. Diaz objects to the factual assertion in paragraph 19 that she was a member of the Aispuro DTO, because she: (i) never sold drugs; (ii) was never involved in drug transactions; and (iii) never packaged drugs.  See Objections ¶ 2, at 2.  She asserts that she only sent "a very small amount of money to Mexico to Mr. Aispuro's family members."  Objections ¶ 2, at 2.  Y. Diaz also objects to the assertion in paragraph 26, that she was present during a drug transaction on October 11, 2008.  See Objections ¶ 3, at 3.  Y. Diaz objects to paragraphs 28 and 59 to the extent that they suggest that Y. Diaz "knowingly sent money to anyone but [Aispuro's] family members."  Objections ¶ 4, at 3.  With respect to paragraph 60, Y. Diaz objects to the allegation that she received $10,000.00 and/or $11,500.00 from individuals who

purchased methamphetamine from unidentified members of the Aispuro DTO. See Objections ¶ 5, at 3. She objects to paragraph 62 to the extent that it states that "she was with Aispuro during the majority of his drug transactions" or suggests that Aispuro "told her what he was doing during each of his transactions." Objections ¶ 6, at 3. Y. Diaz objects to all factual allegations contained in paragraphs 63 and 73, other than those to which she admitted in her Plea Agreement. See Objections ¶ 7, at 3. She also objects to those paragraph's conclusions that her role was extensive and warrants an aggravating role adjustment. See Objections ¶ 7, at 3. She objects to similar factual allegations in paragraph 69 "attempting to connect her to Mr. Aispuro's DTO and ascribing liability to her for Mr. Aispuro and his associates' alleged drug distribution quantities." Objections ¶ 8, at 4. She argues that her base offense level should not be 38. See Objections ¶ 8, at 4.

On October 25, 2011, Y. Diaz filed her Sentencing Memorandum. See Doc. 30. Y. Diaz requests that the Court vary downward and sentence her to a term of 2-years probation. See Sentencing Memorandum at 1. She recounts her parents' unhappy marriage, and asserts that it was "fraught with violence and alcohol abuse." Sentencing Memorandum at 1. She states that her parents were barely able to support their large family and that she was frequently without electricity or running water. See Sentencing Memorandum at 2. She asserts that her parents were absent during the "daylight hours of her formative years" and that when they were around they fought violently in front of their children. Sentencing Memorandum at 2. Y. Diaz asserts that she frequently saw her father beat her mother, that her mother drank excessively to cope, and that her father had an affair. See Sentencing Memorandum at 2. She states that she moved to Mexico with her father and siblings after her father was diagnosed with cancer. See Sentencing Memorandum at 3. After a few months, her father learned that his diagnoses was not as grave as originally thought

and left Y. Diaz with her siblings in Mexico to fend for themselves.  See Sentencing Memorandum at 3.  She asserts that, on one of her father's rare visits to them in Mexico, he asked for her earnings to take a "paramour" out; when Y. Diaz refused, he attacked her and attempted to stab her. Sentencing Memorandum at 4.  When she was fifteen years old, Y. Diaz returned to the United States.  See Sentencing Memorandum at 4.  Y. Diaz states that, when she was seventeen, she moved in with her sister's family and that her brother-in-law, a methamphetamine user, introduced her to Aispuro.  See Sentencing Memorandum at 5-6.  She states the relationship lasted only a few months at that time, and that a second boyfriend beat and raped her.  See Sentencing Memorandum at 6.  She states that she confided in Aispuro about the abuse and he helped her escape that relationship. See Sentencing Memorandum at 6.  Y. Diaz asserts that she married Aispuro in a non-legal ceremony in Mexico after her twentieth birthday, but that Aispuro "was having liaisons with prostitutes and an ex-girlfriend."  Sentencing Memorandum at 7.  She asserts that, at some point in their relationship, she became aware that Aispuro made money selling methamphetamine, but that she "had no idea of the magnitude of his criminal enterprise."  Sentencing Memorandum at 7.

Y. Diaz asserts that her role in the offense "involved sending money to Mexico that she understood was destined for Mr. Aispuro's elderly sick mother and his older child residing in Mexico."  Sentencing Memorandum at 8.  She represents that she "never knowingly sent money to any of Mr. Aispuro's drug associates to pay for drug transactions and she does not believe that she ever did so."  Sentencing Memorandum at 8.  Y. Diaz states that, after the entry of her guilty plea on November 6, 2009, she was released on her own recognizance and that the United States Pretrial Services has supervised her without incident for two years.  See Sentencing Memorandum at 8-9. She represents that she has been in counseling, and that she is beginning to understand her relationship with Aispuro and her parents better.  See Sentencing Memorandum at 9.  She states that

she cares for Aispuro's child with another woman every day from 6 a.m. to 8 p.m.  Sentencing Memorandum at 9.  She asserts that, since her parents' deaths, she has been caring for her youngest sister, Fidela Diaz, who recently turned eighteen and is entirely dependent on Y. Diaz for financial support and care.  See Sentencing Memorandum at 10.  Diaz states that none of her other siblings are willing to care for F. Diaz and that F. Diaz will become homeless if Y. Diaz is incarcerated. See Sentencing Memorandum at 10.

Y. Diaz contends that the 18 U.S.C. § 3553(a) factors support the downward variance to 2-years probation that she requests.  See Sentencing Memorandum at 11-12.  She argues that her history and characteristics support a downward variance, because: (i) she suffered from abuse and neglect throughout her childhood; (ii) she lacked guidance as a youth; and (iii) she is contributing to society in a positive way by caring for her sister and Aispuro's son.  See Sentencing Memorandum at 12.  Y. Diaz asserts that, while her crime was serious, it was "not of the scope and nature of the typical money laundering schemes one generally sees in drug trafficking prosecutions." Sentencing Memorandum at 13.  She argues that, given her role, a sentence of 2-years probation, in addition to the two years she has spent on pretrial release, "is sufficiently harsh to punish Ms. Diaz for her crime and adequately expresses society's outrage over her conduct."  Sentencing Memorandum at 14.  Diaz asserts that she has demonstrated amenability to rehabilitation and that she has been a "model pre-trial supervisee."  Sentencing Memorandum at 14.  She contends that the Court can impose conditions as part of her probation that will provide her with "the needed education, training, and counseling care to grow and overcome the problems she has had in the past."  Sentencing Memorandum at 14.  Y. Diaz asserts that she does not need to be incarcerated to serve the goals of incapacitation, because she does not pose a threat to the public, is gainfully employed, and serves as caretaker to two dependants.  See Sentencing Memorandum at 15.  With

respect to deterrence, Y. Diaz contends that she does not need to be specifically deterred, because "her experience during the past two years has turned her path."  Sentencing Memorandum at 15. She states that "[t]rue deterrence will not be achieved by locking [her] up," but through the continued provision of the therapeutic services from which she has benefitted.  Sentencing Memorandum at 15.  Y. Diaz represents that, because her offense is a Class C felony, she is eligible for a sentence of probation.  See Sentencing Memorandum at 16 (citing PSR ¶¶ 110-11, at 26).  Y. Diaz offers two alternatives for the Court to vary to a sentence of probation: (i) the Court could vary 5-levels to Zone A and sentence her to probation; or (ii) the Court could vary 2- to 4-levels to Zone B and sentence her to some period of electronic monitoring.  See Sentencing Memorandum at 16. She also argues that a sentence of probation would be "sufficient but not greater than necessary to satisfy the goals of sentencing."  Sentencing Memorandum at 16.

On October 25, 2011, Plaintiff United States of America filed the United States' Response to Defendant's Objections to the Pre-Sentence Report (Doc. 29) and Sealed Sentencing Memorandum (Doc. 30).  See Doc. 31 ("Response").  The United States asserts that it is prepared to present testimony which will form a factual basis for the "Offense Conduct" and "Related Cases Information" outlined in the PSR.  Response at 1-2.  With respect to Y. Diaz' contention that she was not a member of the Aispuro DTO, the United States asserts that the "ability [of] a DTO to launder the proceeds of its illegal drug trafficking is vital to its continued existence" and that Y. Diaz' money laundering advanced the affairs of the DTO.  Response at 2. The United States further asserts that it is prepared to offer testimony to support the factual allegations in paragraph 26 that Y. Diaz was present during a drug transaction that took place on October 11, 2008.  See Response at 2.  The United States does not object to modifying the PSR so that paragraphs 28 and 59 reflect that the recipients of the laundered funds were Aispuro's family members.  See Response at 3.  With

respect to the factual allegation that Y. Diaz received drug proceeds, the United States asserts that it is prepared to present evidence in that regard, but that it is unable to support the allegation that Y. Diaz was present at the majority of Aispuro's drug transactions.  <u>See</u> Response at 3.  The United States represents that it is unable to present evidence to overcome Y. Diaz' objection to the aggravating role discussed in the PSR.  <u>See</u> Response at 3.  The United States asserts that, in the Plea Agreement, it agreed that Y. Diaz was a minor participant.  <u>See</u> Response at 3.  With respect to the base offense level, the United States represents that Y. Diaz' "offense level for the underlying offense . . . cannot be determined insofar as the government cannot prove what was reasonably foreseeable to defendant."  Response at 4.

The United States asserts that, "without money launderers such as defendant, Mexican-based drug organizations would have far less influence in this country" and that the "ability to repatriate their ill-gotten proceeds is vital to their continued existence."  Response at 5-6.  The United States argues that "most of defendant's complained-of hardship[s] are conspicuous only by their absence in the PSR."  Response at 6.  It contends that, "[n]otwithstanding her victimization, defendant's personal characteristics, mental and physical health are unremarkable."  Response at 6.  The United States asserts that Y. Diaz' circumstances are within the heartland of similarly situated defendants.  <u>See</u> Response at 6.  It argues that a within guidelines sentence is appropriate under the facts and circumstances, and that any lesser sentence will "fail to afford adequate deterrence to potential future conduct of defendant or others."  Response at 6.  It asks that the Court impose a reasonable sentence.  <u>See</u> Response at 7.

On October 26, 2011, the parties filed their Notice of Stipulation of the Parties Concerning Proposed Amendments to the Pre-Sentence Report.  <u>See</u> Doc. 32 ("Stipulations").  With respect to paragraph 28, the parties propose that the PSR is amended so that "money to his associates in

Mexico" is replaced with "a total of $8320.00 to his relatives in Mexico to cover their living and medical expenses." Stipulations at 1. The parties further stipulate that the phrase "and pled guilty to" should be added to paragraph 59, that the word "associates" should be replaced with "relatives," and that "to cover their living and medical expenses" should be added. Stipulations at 2. The parties propose that paragraph 62 should be amended in the following manner: (i) the statement "however, she was with Aispuro during the majority of his drug transactions that occurred between June 2008 and September 2009. If she was not present, telephone records confirm Aispuro told Y. Diaz what he was doing and where he would be during each of those transactions. Furthermore," should be deleted; and (ii) the USPO should add that the Western Union wire transfers were to "his relatives in Mexico to cover their living and medical expenses." Response at 2. The parties agree that paragraph 63 should be amended to: (i) delete the phrase "of Javier Aispuro's drug transaction, and in many cases, was with him when the events occurred"; (ii) add the phrase "that the money she transferred to Mexico at Mr. Aispuro's behest was the proceeds of drug trafficking activity"; (iii) delete the sentence "Because of this, Diaz could be held accountable for the entire amount of methamphetamine distributed, which at a minimum is 19.278 kilograms"; (iv) delete the phrase "the Drug Trafficking Organization" and replace it with "Javier Aispuro"; (v) add the sentence "Beyond this, there is insufficient evidence to demonstrate what acts and omissions of others in furtherance of the underlying drug trafficking conspiracy were foreseeable to Ms. Diaz"; and (vi) delete the sentence "Based on this information, Diaz' role in the instant offense can be seen as otherwise extensive, warranting an increase pursuant to aggravating role." Response at 3. The parties propose that the USPO add

> if (A) the defendant committed the underlying offense (or would be accountable for
> the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct));
> and (B) the offense level for that offense can be determined; or the base offense level

should be 8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds.

Stipulations at 4. The parties propose that the USPO delete from paragraph 69 the allegations which state:

As such, the base offense level is established at U.S.S.G. § 2S1.1(a)(1), by proceeding as directed to U.S.S.G. § 2D1.1, where we first determine the offense level, including application of any relevant Specific Offense Characteristics and cross references. This would include an assessment of the defendant's role in the drug distribution conduct and any applicable Specific Offense Characteristics (SOC), including whether the defendant qualifies for application of the 'Safety Valve' provision in accordance with U.S.S.G. § 5C1.2. It is noted that a role adjustment for money laundering conduct is not to be applied yet, pursuant to U.S.S.G. § 2S1.1, Application Note (2)(c) Application of Chapter 3 Adjustments.

Once application of U.S.S.G. § 2D1.1 has yielded an adjusted offense level, we return to U.S.S.G. § 2S1.1(a)(1) with a beginning base offense level. The remainder of the application guideline for this case, including any Specific Offense Characteristic adjustments, would be applied at U.S.S.G. § 2S1.1

Stipulations at 5. The parties suggest that the USPO should add the phrase "and Ms. Diaz was aware of the fact that he was involved in methamphetamine dealing." Stipulations at 5. The parties further agree that the USPO should delete the language which states:

During the six months in which the offense conduct took place, the defendant was present with Aispuro during a number of the drug transactions in which he participated. Additionally, at the behest of Aispuro, the defendant was the main person to send the money received from the sale of methamphetamine to individuals in Mexico. Based on this information, the defendant should be held accountable for at least 19.278 net kilograms of methamphetamine. Pursuant to U.S.S.G. § 2D1.1(c)(1), her base offense level should be 38. At U.S.S.G. § 2D1.1., the defendant does not qualify for a 'Safety Valve' reduction, as several firearms were found at her residence and in her vehicle at the time the search warrant was executed on December 17, 2008. Therefore, pursuant to U.S.S.G. § 2S1.1(a)(1), the base offense level begins at 38.

Stipulations at 5. This language should be replaced with:

Under 2B1.1 in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), Defendant would be responsible for all

reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity. However, there is insufficient evidence to demonstrate what other acts and omissions of others in furtherance of the underlying drug trafficking conspiracy were foreseeable to Ms. Diaz. Therefore, the offense level for the underlying offense could not be determined with regard to Ms. Diaz and 2S1.1(a)(1) does not apply in the case.

Pursuant to § 2S1.1(a)(2), and as stipulated in the plea agreement, the base offense level for Ms. Diaz's money laundering is 8 plus the number of offense levels from the table in § 2B1.1 which in this case is a two level increase, as the defendant laundered more than $5,000 but less than $10,000. Based on the information, the defendant's base offense level is 10. It should be noted, the plea agreement states the defendant's base offense level should be 18, however this calculation is based on the addition of the 6 level enhancement for Specific Offense Characteristics discussed below.

Stipulations at 5-6. Furthermore, the parties agree that the USPO should delete from paragraph 69

the following language:

However, pursuant to the plea agreement, the defendant and the Government stipulate the defendant is to be held accountable for at least $5,000.00 but less than $10,000 United States Currency. Pursuant to U.S.S.G. § 2S1.1(a)(2), the base offense level will be 8, plus the number of offense levels from the table in U.S.S.G. § 2B1.1, which in this case is a two level increase, as the defendant laundered more than $5000. Based on this information, the defendant's base offense level is 10. It should be noted, the plea agreement states the defendant's base offense level should be 18; however the plea agreement adds the Specific Offense Characteristics into the calculations.

Stipulations at 6.

The parties further stipulate that paragraph 70 should be modified. <u>See</u> Stipulations at 6.

The parties agree that paragraph 70 should be modified so that the first paragraph remains the same

and that second paragraph now reads:

As laid out above, U.S.S.G. § 2S1.1(a)(2) applies in this case. Pursuant to U.S.S.G. § 2S1.1(b)(1) where subsection (a)(2) applies and the defendant knew or believed that any of the laundered funds were the proceeds of an offense involving the manufacture, importation, or distribution of a controlled substance or a listed chemical, increase by 6 levels. Therefore, a six level increase has been applied. The plea agreement notes the defendant is being held accountable for conduct under U.S.S.G. § 2S1.1(a)(2) and the parties applied this six level increase in arriving at the

stipulated offense level of 18.

Stipulations at 7.  With respect to paragraph 73, the parties agree that the sentence "Pursuant to U.S.S.G. § 3B1.1(c), if the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels" should be replaced with "Pursuant to U.S.S.G. § 3B1.2(b) if the defendant was a minor participant in any criminal activity, decrease by 2 levels."  Stipulations at 7.  Additionally, the parties agree that the following should be deleted from paragraph 73:

> As previously noted, the defendant was with Javier Aispuro during the majority of his drug transactions that occurred between June 2008 and December 2008.  If she was not present, telephone records confirm Aispuro told Diaz what he was doing and where he would be during each of those transactions.  Furthermore, Diaz followed Aispuro's instructions and regularly sent money via Western Union wire transfers to associates in Mexico.  Additionally, Diaz was the individual who opened the business account for Amazing Audio and Detail, the business owned by Adam Anderson and Jaime Aispuro.  The true amount of money Diaz transferred to Mexico on behalf of the Drug Trafficking Organization is unknown.  Based on this information, Diaz role in the instant can be seen as otherwise extensive, warranting an increase pursuant to aggravating role.

> However,

Stipulations at 8.  Finally, paragraph 73 should be amended to reflect that Y. Diaz is a "minor participant in the money laundering scheme."  Stipulations at 8.

The Court held a sentencing hearing on October 27, 2011.  The Court asked the parties whether a number of the objections would be moot, if the Court accepts some or all of the Stipulations.  See Transcript of Hearing at 2:20-25 (October 27, 2011)(Court)("Tr.").[2]  Y. Diaz asserted that, if the Court accepts the Stipulations, there are only three remaining objections and characterized them as minor objections.  See Tr. at 3:1-5 (Khalsa).  The Court stated that the USPO

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

had indicated that there was evidence that Y. Diaz sent money to Aispuro's associates in Mexico and asked the United States whether it could prove that fact by a preponderance of the evidence. See Tr. at 3:6-14 (Court). The United States responded that it was likely the case that it could not prove by a preponderance of the evidence who received the funds and that, for the purposes of the offense, it is irrelevant who received the laundered funds. See Tr. at 3:15-22 (Meyers). Y. Diaz agreed that who received the laundered funds does not affect the guilty plea, but stated that it demonstrates her intentions. See Tr. at 4:3-8 (Khalsa). With respect to the stipulation to the amount of money, the Court stated that it appeared the United States is not prepared to say that the $8,230.00 is the maximum amount that Y. Diaz laundered, but that the United States could prove only that amount. See Tr. at 4:9-13 (Court). The United States agreed it is not prepared to state that the $8,230.00 is the maximum that Y. Diaz laundered, but conceded that it cannot prove that Y. Diaz laundered more funds. See Tr. at 4:14-18 (Meyers). Y. Diaz and the USPO both stated that there were no objections to the Court adopting the stipulation with respect to the amount laundered. See Tr. at 4:19-5:5 (Court, Khalsa, Probation Officer). The Court asked whether the United States could prove by a preponderance of the evidence that Y. Diaz was with Aispuro during a majority of his drug transactions or that she was involved in the Aispuro DTO's drug-trafficking activities. See Tr. at 5:16-22 (Court). The United States asserted that, after looking at the charge to which Aispuro pled guilty, it was appropriate to correct the PSR and remove language suggesting that Y. Diaz was present for the majority of Aispuro's drug transactions. See Tr. at 5:23-6:2 (Meyers). Y. Diaz argued that she was not aware of all of Aispuro's activities and that it was during this time period that Aispuro fathered a child with another woman. See Tr. at 6:6-12 (Khalsa). The USPO stated that the assertion that Y. Diaz was present for the majority of Aispuro's drug transactions was based on the discovery; it conceded, however, that Y. Diaz may not have known about the

-15-

transactions.  <u>See</u> Tr. at 6:15-7:1 (Court, Probation Officer).  The United States agreed with the USPO's statement that discovery showed Y. Diaz was present for some drug transactions, but asserted that it could not prove that she was there for a majority of them or that she knew that drug transactions were taking place.  <u>See</u> Tr. at 7:2-9 (Meyers).  The Court asked whether it should accept the stipulation as written and then add the sentence: "There is evidence in the Government's file that Diaz was with Aispuro during some transactions, but the United States represented that it was not prepared to prove by a preponderance of the evidence that she was aware the drug transactions were occurring."  Tr. at 7:10-17 (Court).  The United States, Y. Diaz, and the USPO agreed that the Court's proposed addition was acceptable.  <u>See</u> Tr. at 7:18-8:25 (Court, Meyers, Khalsa, Probation Officer).

The United States also represented that it was not prepared to prove by a preponderance of the evidence that Y. Diaz should be held accountable for the entire amount of methamphetamine attributed to Aispuro.  <u>See</u> Tr. at 9:1-9 (Court, Meyers).  The USPO asserted that, based on the discovery material that the United States provided, the base offense level was correctly calculated at 38 and Y. Diaz should be held accountable for the 19.278 net kilograms of methamphetamine that Aispuro distributed.  <u>See</u> Tr. at 9:21-10:3 (Probation Officer).  Y. Diaz argued that, for U.S.S.G. § 2S1.1 to apply, she had to have committed the underlying drug-trafficking offense or be accountable for it as relevant conduct.  <u>See</u> Tr. at 10:16-11:14 (Khalsa).  She further asserted that, during the only drug transaction the USPO specifically mentioned in the PSR, she was in the car and the drug amount was indeterminable.  <u>See</u> Tr. at 10:16-11:14 (Khalsa).  The USPO responded that Aispuro pled guilty to the drug-trafficking conspiracy and that all the members of the conspiracy can be held accountable for the total amount of drugs in the conspiracy.  <u>See</u> Tr. at 11:20-22 (Probation Officer).  The United States asserted that Y. Diaz was involved in the conspiracy to the

extent that she laundered money for it, but argued that it would be unreasonable to attribute all the actions of the conspiracy to her as relevant conduct.  See Tr. at 12:3-13:3 (Meyers).  The United States represented that it was not able to articulate the portion of the underlying conspiracy that would be reasonably foreseeable to her, given her limited role, and determined that it was not appropriate to hold Y. Diaz accountable for the 19.178 net kilograms of methamphetamine.  See Tr. at 13:3-9 (Meyers).   The United States reiterated that it was not prepared to prove, by a preponderance of the evidence, that Y. Diaz was responsible for the methamphetamine.  See Tr. at 15:12-16:12 (Court, Meyers).  The Court stated that, based on the United States' representations that it could not prove this fact by a preponderance of the evidence, the Court would accept the stipulation.  See Tr. at 17:9-14 (Court).   The Court also found that, because it accepted the stipulation with respect to paragraph 69, it would accept the parties' alterations to paragraph 70. See Tr. at 17:15-24 (Court, Probations Officer, Meyers, Khalsa).

The Court stated that it was most concerned with the parties' proposed modifications to paragraph 73, which applied a 2-level reduction in Y. Diaz' base offense level for being a minor participant.  See Tr. at 17:25-18:7 (Court).  The Court stated that it could see applying a minor role adjustment, if all Y. Diaz did was transfer money -- likening her to a mere courier, for whom it often gives role adjustments -- , but that the Court was troubled that Y. Diaz opened bank accounts for the Aispuro DTO.  See Tr. at 18:8-20 (Court, Khalsa).  The Court said that no one was suggesting that Y. Diaz should get an enhancement and that the question was whether she should get minor-participant reduction.  See Tr. at 19:12-15 (Court).  The Court then asked whether the United States was prepared to prove that Y. Diaz was the individual who opened the business banking account for Amazing Audio and Detail.  See Tr. at 19:17-22 (Court).  The United States asserted that it could prove that Y. Diaz opened the bank account, but stated that the United States did not believe that it

was an important consideration.  See Tr. at 19:23-20:2 (Court, Meyers).  Y. Diaz contended that the language, as amended, makes clear that she was not the only one involved in the money laundering, because she was acting at Aispuro's direction.  See Tr. at 21:5-11 (Khalsa).  The Court stated that it was not sure that fact helped her, because in the laundering scheme Y. Diaz appears to be the average participant, whereas she is a minor participant in the drug conspiracy.  See Tr. at 21:16-22:2 (Court).  Y. Diaz responded that, if the Court looked at the money laundering scheme as supporting the Aispuro DTO, then Y. Diaz is a minor participant, and she asserted that no one would argue that money was being laundered to Mexico through other sources as well.  See Tr. at 22:3-17 (Khalsa).  The United States agreed that a courier analogy was apt and that Aispuro determined: (i) the amount wired; (ii) to whom the funds were transferred; and (iii) the purpose of the funds.  See Tr. at 23:19-24:17 (Meyers).  The United States asserted that it was not prepared to prove that the business account was related to the money laundering charges and Y. Diaz clarified that the account never held more than $100.00.  See Tr. at 26:7-19 (Court, Meyers, Khalsa).  The USPO agreed that the Court should focus on the money laundering scheme when determining Y. Diaz' role.  See Tr. at 27:14-18 (Probation Officer).  Y. Diaz asserted that, whether the Court looked at her role in the money laundering scheme or within the larger DTO, she is entitled to a minor participant role adjustment.  See Tr. at 27:21-28:22 (Khalsa).  The USPO asserted that, when it determined Y. Diaz' role, it looked solely at her involvement in the money laundering, but stated that the information provided to the Court suggested that Y. Diaz may be a minor participant.  See Tr. at 29:4-11 (Probation Officer).  The USPO stated that, if Y. Diaz acted at Aispuro's direction, she could be seen as a courier in the money laundering scheme.  See Tr. at 29:15-23 (Probation Officer).  The United States, Y. Diaz, and the USPO all agreed that the Court should look at the entire Aispuro DTO to determine Y. Diaz' role.  See Tr. at 29:24-30:9 (Court, Probation Officer, Khalsa, Meyers).

-18-

The Court then found that Y. Diaz was a minor participant in the Aispuro DTO.  See Tr. at 30:10-17 (Court).

Y. Diaz asked that the Court add a sentence to paragraph 26 of the PSR to reflect that, with respect to the October 11, 2008, drug transaction, she was present as a passenger in Aispuro's vehicle, but that the transaction took place outside of her presence.  See Tr. at 31:5-12 (Khalsa).  The United States and the USPO did not object to adding such a line, and agreed that the evidence supported such a statement.  See Tr. at 31:13-25 (Court, Meyers, Probation Officer).  Y. Diaz agreed that the Court had addressed all the of Diaz' Objections.  See Tr. at 33:22-24 (Court, Khalsa).  Y. Diaz asked that the Court amend paragraph 73 to reflect that she was a minor participant in the DTO and to strike the portion of the paragraph referencing U.S.S.G. § 2S1.1.  See Tr. at 34:6-14 (Khalsa).  The United States and the USPO agreed to those changes.  See Tr. at 34:15-35:7 (Court, Probation officer, Khalsa, Meyers).  The Court noted that the total offense level is 13 and the criminal history category is I, establishing a guideline imprisonment range of 12 to 18 months.  See Tr. at 33:25-34:5 (Court, Khalsa).

Y. Diaz then argued in support of her requested variance.  Y. Diaz asserted that she was never indicted in this case, but pled guilty to the Information, and that she has done "exceptionally well" on pretrial release.  Tr. at 35:14-25 (Khalsa).  Y. Diaz represented that she is currently taking care of her youngest sister, F. Diaz, and that none of Y. Diaz' other siblings could care for her.  See Tr. at 35:25-36:21 (Court, Khalsa).  Diaz asserted that, if she is sent to prison, F. Diaz will be forced to drop out of high school and fend for herself.  See Tr. at 36:20-37:1 (Khalsa).  Furthermore, she represented, she has been caring for Aispuro's child with another woman, and that, for all intents and purposes, she is the child's primary caregiver.  See Tr. at 37:8-11 (Khalsa).  She asserted that the child's mother is uninterested in caring for the child and that, until recently, he was under Y.

Diaz' sole care.  See Tr. at 37:16-23 (Khalsa).  Y. Diaz stated that she has a power of attorney and would become the child's guardian if anything happened to the child's mother.  See Tr. at 37:24-38:3 (Khalsa).  She asserted that Aispuro saved her from a horrific relationship and that she viewed him as her savior.  See Tr. at 38:4-16 (Khalsa).  She argued that she has been attending counseling for a year and that it has been a tremendous help to her.  See Tr. at 38:17-20 (Khalsa).  Y. Diaz stated that she works six days a week and asserted that incarceration would set her life back tremendously.  See Tr. at 39:6-25 (Khalsa).  Y. Diaz asked the Court to sentence her to a term of probation.  See Tr. at 39:17-25 (Khalsa).  Y. Diaz also spoke on her own behalf and expressed remorse for her offense.  See Tr. at 40:14-41:6 (Diaz).  She stated that she accepted responsibility for her actions and would not break the law again.  See Tr. at 41:10-14 (Court, Diaz).

The United States asserted that Y. Diaz should not get special credit for doing what was expected of her on pretrial release.  See Tr. at 43:2-10 (Meyers).  The United States then turned to the familial obligations Y. Diaz has and asserted that, while they were important considerations under 18 U.S.C. § 3553(a), the guidelines represent the most reasonable sentence.  See Tr. at 43:15-44:4 (Meyers).  The United States argued that Aispuro's child has a mother to care for him and that Y. Diaz' involvement in his life should not be a major consideration for the Court.  See Tr. at 44:5-9 (Meyers).  It also stated that the United States had a difficult time with Y. Diaz' characterization of moving her life forward when she still maintains a relationship with Aispuro, who involved her in this criminal offense.  See Tr. at 44:10-22 (Meyers).  Y. Diaz stated that she only pointed to her behavior on pretrial release to show that she does well on supervision.  See Tr. at 45:17-23 (Khalsa).  Y. Diaz informed the Court that she has a land line telephone and that she would not be opposed to participating in an electronic monitoring program.  See Tr. at 47:17-48:8 (Court, Khalsa).

## LAW REGARDING MITIGATING ROLE ADJUSTMENTS

U.S.S.G. § 3B1.2 authorizes courts to reduce a defendant's offense level if the defendant was a minimal or minor participant in an offense.  See U.S.S.G. § 3B1.2; United States v. Aguilar, No. 04-311, 2005 WL 2313585, at *3 (D.N.M. Aug. 18, 2005)(Browning, J.).  U.S.S.G. § 3B1.2 provides in full:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> (a)    If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
>
> (b)    If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
>
> In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2.  Application note 3 indicates that this guideline "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant."  U.S.S.G. § 3B1.2 cmt. n.3(A).  Application note 3 further confirms that a court's task in determining the application of this guideline is highly fact-based: "The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, involves a determination that is heavily dependent upon the facts of the particular case."  U.S.S.G. § 3B1.2 cmt. n.3(A).

In an amendment to this guideline effective on November 1, 2011, the United States Sentencing Commission removed the following sentence from application note 4: "It is intended that the downward adjustment for a minimal participant be used infrequently."  U.S. Sentencing Manual app. C, vol. III, at 406 (2011).  As a reason for this change, the Sentencing Commission stated: "The Commission determined that [this sentence is] unnecessary and may have the unintended effect of

-21-

discouraging courts from applying the mitigating role adjustment in otherwise appropriate circumstances." U.S. Sentencing Manual app. C, vol. III, at 406. Subsection (a) regarding minimal participants covers defendants who are plainly among the least culpable of those involved in the conduct of a group. See U.S.S.G. § 3B1.2 cmt. n.4. See also United States v. Justice, No. 09-3078, 2012 WL 394455, at *9 (D.N.M. Jan. 23, 2012)(Browning, J.). Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant. See U.S.S.G. § 3B1.2 cmt. n.4. Subsection (b) covers a defendant who "is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. n.5.

## ANALYSIS

The Court will accept the parties' Stipulations as to the facts to which Y. Diaz objected. Because the United States represented that it could not prove the facts included in the PSR to which Y. Diaz objected by a preponderance of the evidence, the Court will amend the PSR to reflect the parties' modifications and sustain the Objections. The Court will also accept the parties' stipulation to Y. Diaz' minor role in the Aispuro DTO. The Court will impose a sentence of 3-years probation with eight months electronic monitoring.

## I.   THE COURT WILL SUSTAIN THE OBJECTIONS TO THE PSR AND ACCEPT THE PARTIES' STIPULATION TO Y. DIAZ' MINOR ROLE.

The United States and Y. Diaz stipulated to modifications to the PSR which addressed Y. Diaz' Objections to paragraphs 28, 59, 62, 63, 69, 70, and 73. See Stipulations at 1-9. At the hearing, the United States asserted that it would not be able to prove the facts to which Y. Diaz objected by a preponderance of the evidence and that was why it agreed to the Stipulations. See e.g., Tr. at 3:15-22 (Meyers). See also United States v. Manatau, 647 F.3d 1048, 1054 n.2 (10th Cir.

2011)(noting that the preponderance-of-the-evidence standard applies during sentencing). Accordingly, the Court accepts the Stipulations and will sustain the Objections. Additionally, in accordance with the parties' discussion at the hearing, the Court will modify paragraph 26 of the PSR to reflect that, during the October 11, 2008 drug transaction, Y. Diaz was present as a passenger in Aispuro's vehicle, see Tr. at 31:5-12 (Khalsa), and paragraph 73 to strike the portion of the paragraph referencing U.S.S.G. § 2S1.1, see Tr. at 34:6-14 (Khalsa)

The Court accepts the parties' stipulation in the Plea Agreement that Y. Diaz was a minor participant in the DTO, under U.S.S.G. § 3B1.2, and will modify paragraph 73 to reflect that role. At the hearing, the parties agreed that the Court should look at the entire Aispuro DTO to determine Y. Diaz' role, because her offense involved the proceeds of the DTO and because she followed Aispuro's directions. See Tr. at 29:24-30:9 (Court, Probation Officer, Khalsa, Meyers). The United States represented that a courier analogy was apt, because Y. Diaz did not determine: (i) the total amount wired; (ii) the identity or role of those to whom the funds were transferred; or (iii) the purpose of the funds. See Tr. at 23:19-24:17 (Meyers). The United States also asserted that it was not prepared to prove that the business account that Y. Diaz opened for Aispuro and Anderson was related to the money laundering charges and Diaz clarified that the account never held more than $100.00. See Tr. at 26:7-19 (Court, Meyers, Khalsa).

The criminal organization here was relatively complex with eight co-Defendants charged with conspiracy and at least fifteen uncharged members. See PSR ¶ 14, at 5. Although Y. Diaz was charged separately from the conspiracy defendants, her offense conduct was in furtherance of the Aispuro DTO, because she laundered the drug-trafficking proceeds. See Plea Agreement ¶ 7, at 3. On the other hand, none of the methamphetamine involved in the Aispuro DTO was attributed to Diaz, see Tr. at 15:12-16:12 (Court, Meyers), and the United States has evidence that Y. Diaz was

present only on one occasion while Aispuro engaged in drug-trafficking.  See PSR ¶ 26, at 8-9.  The

United States and Y. Diaz liken her conduct to that of a courier, which the Court has often held

warrants a role reduction.  See United States v. Colaiezzi, No. 09-0592, 2010 WL 5477154, at *2

(D.N.M. Dec. 16 , 2010)(Browning, J.)("The Court will accept the stipulation that M. Colaiezzi was

a minor participant, because it appears from the information available to the Court that she was not

more than a courier."); United States v. Guerrero-Marquez, No. 07-1050, 2007 WL 5685113, at *8

(D.N.M. Dec. 13, 2007)(Browning, J.)("[T]he Court is comfortable accepting the stipulation to a

minor role adjustment, because he was apparently no more than a courier and couriers usually

receive some role adjustment in this District . . . .").  To be characterized as a minor participant, a

defendant must be substantially less culpable than the average participant in the crime.  The Court

agrees with the parties' characterization of Y. Diaz as a courier -- a courier of money.  The facts

before the Court demonstrate that she transferred between $5,000.00 and $10,000.00, a small

amount of money when the conspiracy sold approximately $36,000.00 in methamphetamine each

week.  See PSR ¶ 16, at 6.  Furthermore, Y. Diaz worked at Aispuro's direction and had no

independent authority with respect to the transfers.  See Tr. at 23:19-24:17 (Meyers).  While Y. Diaz

was not the least culpable member of this organization, the Court is comfortable finding that Diaz

is substantially less culpable than the other members of this criminal enterprise -- who were involved

in drug trafficking.  Accordingly, the Court accepts the Plea Agreement's stipulation that Diaz was

a minor participant in the criminal activity.

## II.   THE COURT WILL VARY DOWNWARD TO A SENTENCE OF THREE-YEARS PROBATION.

The Court accepts the Plea Agreement in this case.  The Court has carefully reviewed the

PSR's factual findings.  There being no further objections to the PSR's factual findings, after

accepting the parties' Stipulations, the Court adopts those findings as its own.  The Court has also considered the sentencing guidelines application, and the Court adopts the PSR's guideline application as its own.  Finally, the Court has considered the factors set forth in 18 U.S.C. § 3553(a).  The total offense level is 13 and the criminal history category is I, which establishes a guideline imprisonment range of 12 to 18 months.

The Court notes that Y. Diaz laundered between $5,000.00 and $10,000.00 in funds that had been derived from the proceeds of methamphetamine sales.  The Court has carefully considered the guidelines, but, in arriving at its sentence, the Court has taken into account not only the guidelines, but other sentencing goals.  Specifically, the Court has considered the guideline sentencing range established for the applicable category of offense committed by the applicable category of defendant.  After careful consideration of Y. Diaz' case, as well as the Aispuro DTO members' conduct, the Court concludes that the punishment set forth in the guidelines is not appropriate for this sort of offense.  The Court then considered the kinds of sentences and the range that the guidelines establish.  Because the Court wants to express Congress' concern about this criminal offense as much as possible, the Court will not vary 5 offense levels to Y. Diaz' requested sentence within Zone A of the Sentencing Table, which would permit a sentence of probation without intermittent confinement, community confinement, or home detention.  See U.S.S.G. § 5B1.1(a)(1).  The Court believes that a variance of 2 or 3 levels is more appropriate given the discussions before the Court.  First, the Court notes that Y. Diaz needs to continue receiving education, training, and care to prevent this problem from ever reoccurring.  Y. Diaz' behavior on pretrial release encourages the Court, because her record has been very good.  The Court does not put much weight on this factor alone, however, because most defendants will comply with the requirements of pretrial release so that they may emphasize their rehabilitation at sentencing.  The Court also looks to Y. Diaz'

family circumstances.  In some ways Y. Diaz' circumstances are not that compelling, because F. Diaz is eighteen years old and, conceivably, could care for herself.  On the other hand, there is something very compelling about Y. Diaz' willingness to care for a child that is not going to have a father in his life and a sister who would have to drop out of high school without her assistance. The Court recognizes that Y. Diaz' continuing relationship with Aispuro is troubling, and agrees with the United States that, without Aispuro in her life, Y. Diaz would probably not be before the Court.  This reality leads the Court to believe that it does not need to spend a great deal of resources to protect the public from Diaz or to deter Diaz from further criminal activity, because without Aispuro, she is unlikely to engage in criminal conduct.  The Court has given Aispuro a sentence of 135-months imprisonment, so he will probably not be able to induce her into participating in any further criminal conduct.  See United States v. Aispuro, No. 08-2936, 798 F.Supp.2d 1247, 1248 (D.N.M. 2011)(Browning, J.).  The Court notes that Y. Diaz had a very rough childhood and life up until this point.  While many of these circumstances are disfavored factors, the Court believes that, together, they justify a variance.

The Court finds that Y. Diaz' current rehabilitation, family responsibilities, and difficult childhood counsel in favor of a 2-level variance.  Accordingly, the Court will vary 2-levels to Zone B of the Sentencing Table and to a total offense level of 11.  A total offense level of 11 and a criminal history category of I establishes a guideline range of 8 to 14 months.  Within Zone B, it is appropriate to sentence Y. Diaz to three years probation with eight months of electronic monitoring. See U.S.S.G. § 5B1.1(a)(2).  Although Y. Diaz requested a probation term of two years, the Court believes it is necessary to put her on probation for another year given the serious nature of the drug activity that was surrounding her.  The Court believes that eight months of electronic monitoring is adequate to reflect the seriousness of this offense and Y. Diaz' involvement in the overarching

Aispuro DTO.  The Court believes that the eight months of electronic monitoring -- which approximates the length of the guideline range -- appropriately reflects Congress' concern over this crime as much as possible without incarceration.  The Court believe that, given Y. Diaz' particular circumstances, people will understand that this sentence is adequate to promote respect for the law. The Court also believes that this sentence provides a more just punishment, because the Court is not convinced that incarceration is going to serve any purpose here, particularly given the length of time Diaz is facing.  While the Court has some concerns about general deterrence, the Court believes that Diaz will be specifically deterred from engaging in any further criminal activity.  The Court also does not believe that it needs to emphasize protecting the public.  Avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct would counsel in favor of some incarceration.  Because of the structure the Court will put in place, and the eight months of electronic monitoring, the Court does not believe that any unwarranted disparities will result from this sentence.   Furthermore, the Court will impose conditions of probation which will provide Diaz with some needed education, training, and care to prevent recidivism.

The Court concludes that a sentence of 3-years probation, with eight months of electronic monitoring, fully and effectively reflects each of the factors embodied in 18 U.S.C. § 3553(a). While the Court's task, as a district court, is not to arrive at a reasonable sentence -- it is to come up with one that reflects the factors in 18 U.S.C. § 3553(a), see United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("[A] district court's job is not to impose a reasonable sentence.  Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." (citation omitted)) -- the Court believes this sentence is reasonable.  And perhaps most important in this calculation, the Court believes that this sentence

is sufficient, but not greater than necessary to comply with the purposes of punishment Congress set forth in the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 (codified as amended in scattered sections of 18 U.S.C.).  The Court sentences Diaz to 3-years probation with eight months of electronic monitoring.

 **IT IS ORDERED** that: (i) the Defendant's Objections to the Pre-Sentence Report, filed October 24, 2011 (Doc. 29), are sustained; and (ii) the request in the Sealed Sentencing Memorandum, filed October 25, 2011 (Doc. 30), is granted in part and denied in part.  The Court will sentence Defendant Yessenia Diaz to 3-years probation with eight months of electronic monitoring.

             _____
             UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
 United States Attorney
Joel R. Meyers
 Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Kirtan K. Khalsa
Khalsa Law Office
Albuquerque, New Mexico

  *Attorney for the Defendant*